## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cr. No. 05-10173 |
| | ) | |
| DANNY M. KELLY | ) | |

### SENTENCING MEMORANDUM

On August 18, 2005, Danny M. Kelly ("the defendant") pleaded guilty to a single count information charging him with extortion in violation of 18 U.S.C. § 875(d). This court has not yet sentenced the defendant. In a Pre-Sentence Investigation Report ("PSR") submitted to the court, the United States Probation Office concluded that, in accordance with the United States Sentencing Guidelines, the defendant's total offense level would be 18. A total offense level of 18, coupled with a criminal history category I, would yield a presumptive guideline sentencing range of twenty-seven (27) to thirty-three (33) months in prison. The PSR also acknowledges, however, that the statutory *maximum* prison sentence for this offense is twenty-four (24) months.

In analyzing the possible sentencing possibilities, the PSR correctly notes that in the wake of the United States Supreme Court's landmark decision in United States v. Booker, 125 S. Ct. 738 (2005), the Sentencing Guidelines no longer impose a mandatory burden on the federal courts. Although district courts must consider the Guidelines as "guidelines" in their sentencing decisions, courts are no longer required to impose a sentence within the mechanistic strictures of the statutory grid. Rather, courts are free to consider a wide range of factors when deriving the appropriate sentence including the history and characteristics of the individual defendant. Id. at 770.

Here, the history, characteristics, and circumstances of this defendant warrant a sentence of

straight probation. As detailed in this sentencing memorandum and the accompanying report of Tufts New England psychiatrist Dr. Roger Gray, the defendant suffers from a previously undiagnosed mental illness which resulted in a significantly reduced mental capacity that contributed substantially to the commission of the offense on which he plead guilty. (See Report of Roger Gray, M.D. ("Gray Report"), attached hereto as Exhibit A)).

According to Dr. Gray (whose professional Curriculum Vitae is attached hereto as Exhibit B), the defendant has a delusional form of paranoia and grandiose character ideation that played a substantial role in the commission of the instant offense. Moreover, as a product of this illness, the defendant truly believed that his actions were necessary in order to save his family from starvation and destitution. Clearly, the emotional suffering wrought by the defendant's previously undiagnosed psychosis provided the impetus for the bizarre behavior that comprised this unusual crime. In the wake of Booker, these "humanizing" factors can emerge as critical components of the court's less restrictive sentencing analysis. Likewise, the nature and degree of the defendant's illness also provide an independent basis for the court to impose a sentence below both the applicable guideline range and the statutory maximum on grounds of diminished capacity, pursuant to U.S.S.G. 5K2.13.

## FACTS AND BACKGROUND

This extortion case begins and ends with the defendant's recently diagnosed, and previously untreated, mental illness. Born in Chicago, Illinois, to lower middle income class parents in the mid-1950's, the defendant exhibited no signs of mental illness at a young age. Growing up in the dangerous South Side of Chicago amid racial tension and community strife, the defendant and his sister nonetheless had a relatively uneventful childhood. After graduating from high school, the defendant enrolled at DeVry Institute in Chicago where he earned a bachelor's degree in

engineering. Upon his graduation from college, the defendant accepted a job with Bell Laboratories in Chicago. As an engineer for Bell Laboratories, the defendant sincerely believed he enriched society through his work. He described Bell Laboratories as a progressive company that truly cared about the downtrodden.

After about five years, the defendant left Bell Laboratories for the more temperate climate of Boca Raton, Florida. In Florida, he discovered that not every company shared his former employer's concern for society. Disgusted by what he considered to be his new employers' corporate greed and disregard for the welfare of humankind, the defendant relocated to Massachusetts in 1983.

Settling in Chelmsford with his wife, May DeViney, who he married in 1981, the defendant had two children. By all accounts, the defendant was devoted to his wife and children spending a substantial amount of time with them as he worked as an engineer for the Nortel Company ("Nortel"). Unfortunately for the defendant, his work life lacked the tranquility of his home.

The genesis of the defendant's current charge arose within the stressful confines of Nortel. At Nortel, the defendant invented four devices. Believing that Nortel had acquired a patent for the devices in his name, the defendant expected to reap substantial economic benefits from his labor. The economic boon, however, never materialized. Contrary to his expectations, the defendant discovered that Nortel did seek a patent on his inventions, but did not acquire that patent in his name. Hence, the defendant received neither royalties nor credit for his ideas and hard work.

Believing that the law would vindicate him, the defendant filed two civil actions against Nortel seeking $250,000 in compensatory damages. In his two lawsuits against Nortel, the defendant leveled claims of unjust enrichment and breach of contract. The defendant proceeded *pro*

*se*.  The district court1 dismissed the unjust enrichment action on summary judgment, see Fed. R.

Civ. P. 56, and later, the district court2 dismissed the breach of contract action in accordance with

the doctrine of *res judicata*.  See Fed. R. Civ. P. 12(b)(6).  The First Circuit affirmed both

dismissals.  See Kelly v. Nortel Networks Corp., No. 03-1593, 2004 WL 242933 (1st Cir. Feb. 1,

2004) (affirming the dismissal of the breach of contract action); Kelly v. Nortel Networks Corp., No.

01-1135, 2001 WL 1085018 (1st Cir. Sept. 13, 2001) (affirming the dismissal of the unjust

enrichment claim).  While engaged in litigation with Nortel, the defendant believes that the company

conspired to blacklist him from the Massachusetts engineering market.  One of the attorneys at

Hannify & King, the law firm representing Nortel, allegedly told the defendant that "you'd better be

careful [or] we'll ruin your career."  (Gray Report at 2).  Since 1981, the defendant has tried without

success to work as an engineer in Massachusetts or the surrounding New England states.  He

believes that Nortel, Hannify & King, and corporate America, essentially blackballed him as an

engineer and made good on  their overall threat, conspiring to cheat him out his rightfully earned

money and deprive him of gainful employment.

Unable to find refuge through the courts, the defendant sought the assistance of United States

Senators Edward M. Kennedy ("Kennedy) and John F. Kerry ("Kerry") of Massachusetts.  Neither

Kennedy nor Kerry championed the defendant's cause.  Dismayed, the defendant sought refuge

through the United States judiciary.  During the 1990's and into the next decade, the defendant

launched a series of federal lawsuits against politicians, municipalities, corporations, and state

agencies that he believed had conspired to destroy his livelihood.  He sued former Governor William

---

1 The Honorable Douglas P. Woodlock, United States District Judge for the District of
Massachusetts.
2 The Honorable William G. Young, United States District Judge for the District of
Massachusetts.

Weld for allegedly denying him an inspection sticker for his vehicle.  See Kelly v. Weld, 92-1967, 1992 WL 363361 (1st Cir. Dec. 11, 1992).  He sued former Division of Employment and Training Commissioner Nils Nordberg for allegedly imposing unconstitutional travel restrictions on him.  See Kelly v. Nordberg, 848 F. Supp. 282 (D. Mass. 1994) (Young, J.).  He sued the town of Chelmsford for allegedly taking his land by unlawful means.  See Kelly v. Town of Chelmsford, No. Civ.A.02-12238, 2003 WL 21488232 (D. Mass. June 25, 2003) (Zobel, J).  He also sued the McDonald's Corporation and Canobie Lake Park for allegedly violating his civil rights.  See Kelly v. McDonald's Corporation, No. 00-2410, 2001 WL 739251 (1st Cir. June 29, 2001).  Representing himself, none of the lawsuits survived summary judgment.

The dismissals eroded the defendant's faith in the integrity and fairness of the judicial system. The conspiratorial net widened and he viewed even those whom he relied upon for help as part of corporate America's systematic attempt to destroy his life.  His inability to gain work in his field, however, convinced him that he was the powerless target of a vast conglomerate revenge campaign that would eventually kill his family.  Without a means of support in the engineering field, the defendant obtained a job loading and unloading trucks for United Parcel Services ("UPS") as his only means of providing for his family.  Despite working long shifts and difficult hours, he soon concluded that UPS too was part of the conspiracy and filed a lawsuit against the freight company, which is currently pending in this court.

Absent any job, the defendant dipped into his credit cards in order to shelter and feed his family.  By this point, the defendant delusionally believed that the people in charge of corporate America were "trying to destroy [his] family." (Gray Report at 3).  Greed and money, according to the defendant, allowed these uncaring corporations to marginalize and subjugate people like him. He believed that the only way to forestall the destruction of his family and ameliorate the corporate

power imbalance was to acquire large amounts of capital.  Accordingly, the defendant launched a desperate plan.

The defendant believed that he could save his family by cutting the power lines for cable and/or telephone providers such as Verizon, Comcast, AT&T, and MCI.  After cutting the power lines, the defendant sent "demand letters" to the CEOs of these companies demanding the establishment of a bank account with $10,000.00 in cash or he would continue to sever power lines. Although Verizon complied with his demand, the police discovered the defendant's identity and intervened before he accessed any money in furtherance of his delusional plan.

Following his arrest, the defendant retreated to his family for comfort.  The defendant enjoys a strong relationship bond with his children, who have supported him throughout this ordeal.  His wife also supports him. (Copies of letters of support from the defendant's wife, son, daughter, and several former colleagues, are attached hereto as Exhibit C.)  She is, however, angry that her husband endangered the limited finances and emotional well-being of their family by risking incarceration on quixotic, misguided, and unlawful activity.  The defendant, while genuinely remorseful, appears oblivious to the pain inflicted on his family. He still sees himself as the Everyman figure protecting his family and fighting an epic struggle against the evils of rampant capitalism.

## ARGUMENT

A.    The United States Supreme Court's Booker/Fanfan Decision Has Rendered The Sentencing Guidelines Advisory

On January 12, 2005, the United States Supreme Court issued its landmark United States v. Booker, 125 S. Ct. 138 (2005), decision.  In Booker, the Supreme Court held that the principles announced in Blakely v. Washington, 124 S. Ct. 2531 (2004), apply to the United States Sentencing Guidelines.  Blakely, a case interpreting the Supreme Court's earlier decision in Apprendi v. New Jersey, 530 U.S. 466 (2000), held that within a mandatory sentencing scheme where offense levels exist, the Sixth Amendment to the United States Constitution requires that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Blakely, 124 S. Ct. at 2537 (quoting Apprendi, 530 U.S. at 490).  The Blakely Court concluded that the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." Blakely, 124 S. Ct. at 2537 (emphasis in original).  Booker applies the Blakely Court's reasoning to the federal sentencing guidelines and holds that within the context of a mandatory sentencing system, the Sixth Amendment requires the government to prove any sentencing enhancement factors to a jury beyond a reasonable doubt.  Booker, 125 S.Ct. at 749-750.

In a separate majority opinion, the Booker Court also declared that in light of its application of Blakely to the federal sentencing guidelines, the statutory provisions making the guidelines mandatory upon the federal courts are unconstitutional.  Booker, 125 S. Ct. at 756-57.  Hence, the sentencing guidelines are now advisory.  Booker, 125 S.Ct. at 757; United States v. Isler, No. 04-1565, 2005 WL 3061975 (1st Cir. Nov. 16, 2005).  Although courts must still consider guideline ranges, they are also free to tailor the sentence in light of other statutory concerns such as the history and circumstances of the defendant.  Booker, 125 S. Ct. at 757 (citing 18 U.S.C. §

7

3553(a) (Supp. 2004)).  Rather than adhere to a strict and impersonal arithmetical formula, court must now derive a sentence that is reasonable given a host of factors including the defendant's record, the nature of the crime, and the facts and circumstances germane to each case.  See Booker, 125 S. Ct. at 766-67.

      B.   The Circumstances In This Case Favor A Probationary Sentence

Since committing his offense, the defendant has been diagnosed as suffering from a significant mental illness.  Although his condition has gone undiagnosed and untreated for years (if not decades), he clearly suffered from several personality disorders before, during, and after the commission of the instant offense.  Desperation and delusion no doubt drove the defendant to commit the extortion crime.  While the desperation he felt clearly derived from the defendant's decades-long Don Quixote-like obsession with fighting the uncaring conglomerates, the defendant's paranoia prompted him to act in a manner that he confusedly believed would save his family from what he saw as corporate America's deprecations and depravity.

Nothing other than mental illness explains the defendant's actions.  Well-functioning healthy members of society simply do not cut power lines as part of a scheme to demand money from the telecommunications industry.  Although the Government may argue that desperation, fear, and possibly even revenge are the principle factors forming the defendant's subjective motivation for committing this crime, from a medical standpoint, the defendant's acts were the direct product of his mental illness and substantially diminished capacity.

Judging by his fight with corporate America in Florida, the defendant has long suffered with this illness.  No doubt the royalty issues, the taking by eminent domain of a parcel of his hard-earned property, and the dismissals of the other lawsuits exacerbated the defendant's condition.  The fact that no powerful figure would champion his cause no doubt left the defendant with

deepening feelings of anger, paranoia, desperation, and delusional unrest. Pushed in his eyes beyond the limit, these deepening feelings caused him to "snap" and manifested themselves when the defendant cut the Verizon power lines.

The defendant's aberrational conduct was clearly a cry for psychiatric help, for which he remains in obvious, and glaring, need. As Dr. Gray points out in his report, *the defendant suffers from previously undiagnosed psychological conditions including bipolar disorder, delusional disorder, paranoid personality disorder, and an extreme untreated major mental illness wrought by financial stress.* (Gray Report at 8). Dr. Gray maintains that the solution to the defendant's problems is intensive individual psychotherapy, which may include a closely supervised regimen, psychotropic medications and the option of in-patient treatment. (Id.)

From a medical and mental health standpoint, the solution here definitely is not incarceration. As Dr. Gray concludes in his report, "incarceration would solidify [the defendant's] paranoia, worsen his symptoms, solidify his mental illness, and ultimately increase rather than decrease future risks to society or himself." (Id.) Society gains nothing if the court orders the defendant's incarceration. Despite his illness, the defendant, whose previous criminal history was spotless, was neither violent nor poses a danger to any person. Incarceration, however, might further exacerbate the defendant's illnesses. Imprisoned, the defendant no doubt will feel victimized once more by the system. His paranoia will intensify and he may also feel threatened given that his incarceration would have a further deleterious affect on his family's tenuous financial condition. Rather than emerge from prison rehabilitated, the defendant likely will leave bitter, vengeful, and perhaps even a threat to society. In short, it is Dr. Gray's professional medical opinion that any period of incarceration risks exacerbating the defendant's mental condition and paranoia and is likely to render him worse off medically when he comes

out, than when he went in.  Simply put, in this context, Society will not benefit by ignoring, and festering, the defendant's sickness during any period of incarceration.

Other incarceration factors such as the need for deterrence and punishment are not present in this case.  Deterrence is a non-issue because only a mentally ill person would concoct such a bizarre scheme and the incarceration of the defendant will not deter his own mental illness, let alone deter the future conduct of others who also suffer from severe mental illness, whether diagnosed, or undiagnosed.  Given the depths of the defendant's illness, punishment clearly is not the answer in this case.

The defendant stands diagnosed as suffering from a serious mental illness.  His actions should leave no doubt that his illness is genuine and real.  Absent his illness, the defendant might have furthered his contributions to society as a brilliant engineer.  As Dr. Gray points out, with appropriate employment counseling and mental health treatment, the defendant could, one day, again become a fully functioning and productive member of society.  The court, therefore, should fashion a sentence that will optimize the defendant's chances for a full recovery.  While such a sentence should include intensive mental health counseling, employment counseling, and supervised probation, it should not include any period of incarceration.  In this case, by mandating treatment for the mentally ill offender in a humane and non-threatening context, the court will not only serve the defendant's mental health interests but also the larger interests of society as a whole.

C.    The Defendant's Diminished Capacity Warrants A Downward Departure

Under the pre-Booker mandatory guideline system, the defendant would have, alone, moved for a downward departure based upon the defendant's diminished capacity.  See United States Guidelines Manual ("USSG") § 5K2.13.  A downward departure based upon diminished

10

capacity is appropriate when evidence exists that a defendant is less culpable because his actions were rooted in his psychological problems. See United States v. Shore, 143 F. Supp.2d 74, 83 (D. Mass. 2001) (Gertner, J.). Although the psychological problem must contribute to the defendant's decision to commit the offense, it need not be the "but for" cause of the offense. Id. at 80. In this case, however, the defendant's mental illness is the "but for" cause of the offense.

"But for" the defendant's psychological disorders, he would not have committed the instant offense. As previously detailed, Dr. Gray's report concludes that the defendant suffered from his psychological afflictions at the time the committed the instant offense. (Gray Report at 8). Moreover, the defendant's actions were so strange that they immediately suggest that he suffers from mental illness. Even prior to Booker, the United States Sentencing Commission has clearly indicated its preference that individuals suffering from a diminished mental capacity that substantially impairs their judgment at the time they committed the offense should not receive the same sentence as a mentally healthy individual who engages in the same conduct. See USSG 5K2.13. Consistent with both a pre-Booker guideline departure analysis and a less restrictive post-Booker analysis under 18 U.S.C. § 3553(a), the court should give substantial weight to the defendant's psychological condition when fashioning the appropriate sentence. Here, rather than further punish an individual already tortured by his own dementia, the court should take whatever steps are necessary to ensure that he recovers. As previously discussed, any term of incarceration will worsen the defendant's condition. (Gray Report at 8). A probationary term, however, coupled with employment and intensive psychological counseling may allow the defendant to emerge as a fully functioning and productive member of society capable of reaching his full potential as an engineer. If the court elects the option that affords the defendant an opportunity to receive the help he needs, both the defendant and society may one day reap

11

substantial rewards.

## **CONCLUSION**

For the foregoing reasons, the court should sentence the defendant to term of probation with employment counseling and appropriate mental health treatment.

Dated: December 7, 2005

Respectfully submitted,

DANNY M. KELLY,
By his attorneys,

/s/ Brad Bailey
_____
Brad Bailey, BBO#549749
Jeffrey A. Denner, BBO#120520
Gary G. Pelletier, BBO#631732
DENNER O'MALLEY, LLP
Four Longfellow Place, 35th Floor
Boston, MA 02114
(617) 227-2800

Roger H. Gray, M.D.
800 Washington Street
Norwood, Massachusetts 02062
(781) 278-6676

November 2, 2005

Psychiatric Forensic Evaluation

Re: Danny Michael Kelly
D.O.B. 08/09/54
Docket No. 05-10173

I have been asked by Attorneys Jeffrey Denner and Bradford Bailey, who represent Mr. Kelly, to determine to a reasonable degree of medical/psychiatric certainty, whether Mr. Kelly suffered with a psychiatric disorder which substantially contributed to the commission of the offense conduct. Furthermore, I have been asked to discuss whether and how psychiatric treatment should be considered in sentencing Mr. Kelly.

I have prepared this report by interviewing Mr. Kelly for a total of over 6 hours. I began each interview by explaining to Mr. Kelly that the interview was for forensic and not treatment purposes. I explained that any information he shared with me was not confidential and could be presented in written and/or oral form to his attorneys, opposing attorneys, and the Court. I informed him that he was not obligated to answer any or all questions but this information would also be noted in my report. Mr. Kelly reiterated these conditions, and I believe that he understood these conditions. I reviewed the presentence report dated 06/28/05 prepared by Mr. John Bacon and the letter of agreement submitted by U.S. Attorney Michael Sullivan to Attorney Bailey and Mr. Kelly. I also interviewed Mr. Kelly's wife, May DeViney and began this interview by informing her of the conditions of non-confidentiality and non-treatment. She reiterated and I believe understood these conditions.

Overview:

Mr. Bacon's presentence report contains extensive information regarding Mr. Kelly's personal, social, educational, and employment histories. Rather than repeat this information, I will provide a summary and then expand with information provided by Mr. Kelly and his wife.

Mr. Kelly is a 51 year old married Caucasian male. He married Ms. May DeViney in December, 1981. They have 2 children, ages 17 and 20. Mr. Kelly is the youngest of 2 children. He lived with his parents and sister on Chicago's South Side during a time of marked racial and community conflict. He completed high school and a college degree in engineering. He then worked for Bell Laboratories for 4-5 years. Mr. Kelly described this as a very satisfying time because he felt his work was useful, interesting and creative. He felt that his boss and his company "really cared about people."

Mr. Kelly moved to Florida in late 1979 or early 1980. He held a series of jobs from which he was fired or quit. He related having "labor disputes" as being the cause of many of these changes. He and his wife moved to Massachusetts in June, 1983. He worked at several engineering jobs from 1983 to May, 2001. During the late 1980's and 1990's he worked for the Nortel Company. He reports that he invented four devices which he thought were patent protected in his name. He hoped for recognition and substantial financial benefits as a result; however, he says he was subsequently informed that the patents did not belong to him and he would receive neither recognition nor reimbursement. Mr. Kelly described in detail what he felt were illegal machinations and maneuvers by Nortel and Nortel's laws firm, Hannify and King, cheating him out of $250,00 he feels was owed him. Representing himself, he brought unsuccessful law suits against Nortel. Mr. Kelly told me that an attorney at Hannify and King told him that he was powerless, that the law didn't matter, that "we tell the judge what to do…you'd better be careful…we'll ruin your career."

Mr. Kelly went on to reflect "I wouldn't be in this mess if I didn't believe in the law." He then observed that he later realized that he had been "blacklisted." He has not held an engineering job since 2001. He subsequently worked for UPS, loading and unloading trucks. He left that job and currently has a law suit against that company. His family's financial situation worsened, and they used credit cards to pay the mortgage, buy food, and meet other basic expenses. Mr. Kelly indicated that he felt increasingly anxious and depressed. He felt desperate that he might be unable to support his family. He became increasingly obsessed with "wanting my case to be heard." He wanted "justice" for himself and financial security for his family, but he felt profoundly and increasingly pessimistic that this would or could happen.

Mr. Kelly has had multiple jobs over the past 30 years, and excepting his early experience with Bell Labs, virtually all of his jobs have been sources of frustration and a deepening sense of injustice. He sees himself and society as the victim of corporate and legal forces over which he has neither control nor influence. He believes that companies have stolen his inventions, robbed him of time and effort, and conspired to deprive him of a livelihood.

Mr. Kelly describes himself as having a strong sense of fairness. He says that he would not harm individuals. He says that he believes in the rule of law and until recently believed that justice would prevail for him if only "my case would be heard." He complains that Nortel stole his products and inventions, SNI stole his royalties, Hannify and King contributed to ruining his career, government and industry monitored his computer and contributed to "blacklisting" him, and that overall "these companies made millions from my products."

Mr. Kelly reports other injustices against him and his family. He unsuccessfully brought a gender discrimination suit in his wife's behalf in 1987 when he felt she was unfairly terminated from her job. He indicates that the Town of Chelmsford unfairly took a substantial piece of their property by eminent domain, resulting in a significant loss of property value. He claims he has not been paid for this property, and he is currently involved in a law suit against the town.

Page 2

Mr. Kelly describes a situation involving his then 9 year old daughter at Canobie Lake Amusement Park. He alleges that while she was driving "Dodge'm cars", an intoxicated off-duty policeman repeatedly rammed her vehicle and gave her a whiplash injury. When he complained about this to the staff and administration at the park, he was reprimanded. He subsequently unsuccessfully sued Canobie Lake Park. He continues to feel that he failed to protect his daughter.

Mr. Kelly has brought over a dozen law suits against businesses, governments, officials of governments, and individuals. He has represented himself unsuccessfully in all these cases except for a $25 judgment against Grossman's in a small claims matter in which he argued that he had been overcharged $1. He describes himself as having a strong sense of fairness and sees himself as being victimized repeatedly. He now feels disillusioned and says "My major mistake was thinking there were good people in charge. I worked with people [at Bell Labs] who were concerned about society...they were moral people." He believes now that the people who are "in charge are trying to destroy my family." "I have no money. I've been blacklisted, and I can't get a job. I have no future...As long as I have the ability to create, they'll stop me. Greed is destroying things."

Mr. Kelly reports that despite all these difficulties, he has a very good marriage. He describes his wife as being very supportive, but also acknowledges that she is upset about the current charges and problems. Both he and his wife indicate that she feels he has become so focussed on real or imagined injustices that it interferes with his capacity to make good decisions for himself and his family. Both of them report that he has very good relationships with their children. Ms. DeViney describes him as "a great father" who is open and welcoming of his children. She says they are open and feel secure sharing their lives with him. She also reports that her husband has some very close friendships lasting over 20 years. These friends visit regularly and often weekly. Some of them are helping Mr. Kelly by providing him with painting jobs. This has been his primary means of support since leaving UPS.

There is no history of substance abuse, prior criminal acts, or prior arrests. There is no history of childhood eneuresis, fire setting, cruelty to animals or people, or assaults on others. There is no family history of substance abuse or mental illness.

Mr. Kelly reports a history of symptoms consistent with mental illness. He has had difficulty with sleep, appetite, and loss of energy. His wife reports that he has had marked mood swings, chronic anger and irritability (though never directed at family or friends), periods of increased energy alternating with periods of significantly decreased energy. His wife says he spoke with his primary care physician about feeling depressed and possibly being treated, though no treatment took place.

Mr. Kelly was quite open with me as he discussed the offense conduct. He described both what actions he took and his reasons for doing so. He stated "It was an act of desperation...a matter of survival." He feared their house would be foreclosed, and he feared he would be unable to support his wife and children.

Page 3

Mental Status Examination:

Mr. Kelly arrived on time for each interview. He was open and energetic, answering all questions I asked of him. His speech was pressured and rapid. He exhibited flight of ideas, most of which had the common threads of his wish to be understood and complaints of being victimized. He spoke in great detail about his multiple employment and legal problems as well as his discouragement about the overall direction of our society. His primary concern is "surviving". He indicates that although he feels depressed at times, he would not commit suicide. He denies that he would not physically harm people, indicating that he blames society and corporations for his problems. He denies auditory, visual, or olefactory hallucinations. There was no thought broadcasting or ideas of reference. He has elaborate beliefs about being the object of a conspiracy and the victim of multiple legal, employment, and societal conflicts.

His cognitive functioning was grossly intact in terms of recent and remote memory, arithmetic skills, and abstraction. Concentration was quite impaired. He jumped from topic to topic and often strayed rapidly from the focus of questions, though he did not resist being frequently redirected to the question at hand.

He described his mood as anxious. His affect was generally friendly and engaging; however, he also appeared animated, anxious, and angry as he described perceived injustices.

Mr. Kelly's insight was quite poor. He had almost no awareness of the impact of his actions and how damaging his obsessions have been to him, his family, and society. His judgment is profoundly impaired.

Discussion:

Mr. Kelly has a long history of conflict with authority figures. He has been chronically and increasingly obsessed with feeling victimized and powerless. He demonstrates remarkably poor insight and judgment based on delusional belief about conspiracies and a nearly global effort to hurt him. His paranoia is pervasive though does not include his family or close friends. Despite his difficulties, he has a long and successful marriage, good relationships with his children, and long-standing friendships.

There are descriptions which indicate biological manifestations of a mixed mood disorder. He has described depressed mood, anxiety, decreased energy, disturbed sleep, exhaustion, and feelings of hopelessness and despair. He has a history of mood lability, bouts of anger and angry outbursts, increased energy, and sleeplessness. There has been significant and persistent grandiosity in his thinking and behaviour. His thinking has been rigid, obsessive, naïve, infantile, paranoid, and delusional. Although there is no prior psychiatric history, there are strong indications in the information he and his wife provided that he has one or more major mental illnesses.

Page 4

The constellation of symptoms and history lead me to the following DSM-IV-TR diagnoses:

Axis I.  Bipolar Disorder Not Otherwise Specified (296.80)
   R/O Delusional Disorder
Axis II. Paranoid Personality Disorder (301.0)
Axis III. No Active Medical Problems
Axis IV. Extreme – untreated major mental illness, financial stress
Axis V. 30-35 at present

Conclusion:

 In my opinion, to a reasonable degree of medical/psychiatric certainty, Mr. Kelly suffered with and continues to suffer with major mental illness at the time of the offense conduct.  His mental illness substantially and profoundly impaired his judgment and contributed to the commission of the offense conduct.

Sentencing Recommendations:

 In my opinion, to a reasonable degree of medical/psychiatric certainty, Mr. Kelly suffers with previously undiagnosed and untreated major mental illness.  I believe he needs long-term psychiatric treatment as follows:
1.  individual psychotherapy
2.  pharmacotherapy which may include treatment with mood stabilizing medication, anti-depressant medication, neuroleptic medication.
3.  family assessment and support
4.  employment counselling
5.  long term probation
6.  the option of in-patient treatment if clinically necessary

In my opinion, to a reasonable degree of medical/psychiatric certainty, incarceration would solidify his paranoia, worsen his symptoms, solidify his mental illness, and ultimately increase rather than decrease future risks to society or himself.

Respectfully submitted,

Roger H. Gray, M.D.

The Honorable Joseph Tauro                                    November 30, 2005
United States District Court
Boston, MA.

Dear Judge Tauro:

Within the limitations of this short letter I find it hard to explain how I came to feel forced to do what I did. However, I must try to explain, so here it is.

During my 30-year engineering career I worked with and earned the respect of many of the key innovators in this country. For example, in the late 70's I worked with and earned the respect of General Tom Stafford, one of the twelve people in this world who have ever been on the moon. (He even gave me a special award that my son keeps in his room.) I doubt that anyone in your court has not used and benefited from a product I helped to design and build. But the world has changed enormously and I failed to realize that today it seems a man is not measured by what he accomplishes but only by the money that he has. To me this is a truly sad state for mankind.

My engineering career did not just represent income to me; it represented my pursuit of happiness as I truly believe in the future of mankind. But now it is over. Today I am a housepainter and construction laborer. Even in this field pride now comes not from what you accomplish; it is not the quality of your workmanship; bragging rights goes to the person who can make the most money without doing any real work. This is a far cry from the way my grandfather would talk about his accomplishments. I am a true dinosaur in today's environment.

No matter the form of government one lives under, good people will provide good government. This is what I lived in the 70s. Corporation and government leadership was made up of good people who were concerned about the good of the people and society. I was allowed to innovate, create and express myself (express my art.) However, in recent years this would no longer be true. All that mattered in business was the manipulation of money. The open denial of any innovation within the established business world led me to enter the market myself. My attempts were met with hostility and I could get no venture capital and found no practical means to enter the market.

I felt I had to constantly compromise just to be allowed some reduced right to create. I was often asked to provide many free services and even pay, just to try to access the closed markets. This is the situation I found myself in. I was constantly providing products and services for businesses for free, just so I could get attention on my products and thereby acquire access to the closed markets controlled by the corporations. For example, back in the early 90s Verizon (Nynex) had eliminated its programs that allowed product developers to demonstrate and distribute telecom products through its resources. Today to distribute through (or even demonstrate) a product to Verizon, you have to meet a set of partnership agreements. Your product is moot, only your business connections apply. So for me to get into these doors, I was subjected to what I can only describe as scams. I would have to provide services and products for free to Verizon's accepted suppliers based upon promises that they would then allow me to present my own products to Verizon. This is how Verizon has received at least four products that I developed and created. I even provided services to Verizon out of their facilities (I made two trips to their White Plains facility) that I will never receive any compensation for or even be paid for the travel expenses. No seed money or material costs were ever paid to me. Of course this is not equitable.

After years of being cheated and scammed while trying to get access to the closed telephone and computer equipment market I was ready to give up. However, an opportunity with Nortel Networks arose. Nortel Networks promised they would allow me access to their markets if I would build a product

specifically for them.  Of course this was a lot like the other scams that had been pulled on me in the past, but here was the world's largest telecom equipment provider offering me an opportunity.  I could not conceive that this was a scam.  Why would Nortel scam me?  Yet this is what it was.  Over several years while my wife's engineering employment supported our family and my business I spent hundreds of thousands of dollars supporting the creation of the requested products.  I spent thousands of hours developing and supporting the products.  I traveled and worked out of Nortel facilities and represented Nortel at trade shows.  All of this was at my own expense.

Nortel then distributed, sold, and even presented these products that I built and paid for as Nortel inventions.  Nortel claimed copyright of my software without my ever signing it over to them, as required by copyright law.  Nortel made hundreds of millions of dollars on products that were 100% developed by me.  (I could explain the whole scam and the reason for it, but do not have the space in this letter.)  Nortel not only refused to uphold its part of the agreement, but also refused to even pay me one cent for my personal property, my intellectual property and services that they took from me.

How could Nortel do this?  This was clearly against the law.  It made no logical sense to me.  Nortel's attorney (from Hanify and King) - amazingly - told me that the law doesn't matter, they tells the judge what to do.  These attorneys even told me that if I were to pursue the case they would destroy my career, take everything I have away from me, and destroy my family.  At the time I did not believe them.

How could this happen?  I did 100% of the development.  I was the only person in the world with the source code for the products Nortel was selling and claiming copyright to.  Nortel was unquestionably violating the law.  I fought the good fight.  I fought all the way to the U.S. Supreme court multiple times.  No explanation has ever been offered to me.  When I argued that the court had no right to give my life savings and years worth of work to Nortel without some type of jury trail (according to the 7th Amendment) I was simply told that I was patently wrong, so I have never been allowed a jury trial on my issues with Nortel.

I went to the FBI and the US Attorney General.  Both refused to provide me any help.  I solicited help from my Senators and they refused any help.  I argued for days with the FBI.  I met with the FBI; I gave them copies of Nortel flyers and web links that showed that Nortel had claimed copyright to my products.  I gave them copies of the programs that I had edited to say "FBI" rather than "Nortel" to prove I could create the programs.  I even signed a sworn statement, in front of them, that I was the sole developer of the products.  The FBI absolutely refused even to send a letter to Nortel to ask them to justify their copyright claim.  All that seems to have resulted from my attempts is that I feel I have been blacklisted from the engineering field and I have lost everything I have worked for during my life.  (Even after denying me anything, Nortel's people would call me for help with my products.)

As if the Nortel scam were not bad enough, the Town of Chelmsford then conspired to steal my land from me.  (Public records show they selected my land for taking because it would be easier to get than getting a right of way from Massachusetts Electric or B&M Railroad property.  It is clear that they knew they would have an easy time acquiring my land but would have to pay much more to big corporations for their land.  This is why I was offered $1,000 for a corner frontage lot even though the scrap lot across the street had a tax appraisal value of $120,000.)  Once again I fought the fight all the way to the U.S. Supreme Court.  It is hard to imagine, but the court has found that property may be taken without any compensation, based upon who owns the property.  Not only is this a clear violation of the 5th Amendment, but it is just wrong!

In the fall of 2002 I began working at United Parcel Service because they still offer good medical insurance.  The pay rate was less than I was making in 1976, so the job offered no way of supporting my family, but at least I could provide my family medical insurance.  The work was brutal, but it kept my

mind off of negative things. It was like having a job, just without the pay. I was given multiple awards and even employee of the month. Unfortunately for me, after a little over a year UPS decided to take advantage of the present business mentality and start a policy of abusing its labor. This was clearly a move to bust the union, just like business world was suggesting. Now I had to work in a hostile environment. Managers now handled every aspect of the job in cruel and belligerent ways, following workers around and yelling insults at their job performance, age and even religion. No longer was a worker even allowed pride in their work.

So, understand that this is where I sat in November of 2004. My career ruined; I had no means of supporting my family; I felt there was nothing left I could do to correct the situation; every dream gone; no hope for the future. I couldn't help my mother; I couldn't help my sister; I could not even help friends. All I see going on is scams. It seems the only thing one can do to survive is to cheat someone else. This I could not do. I do not even think it is possible for me to cheat another person.

So what made me decide to try extortion?  I began to see that all that matters is having money. If I had money, I would have rights! I could own what I create. I could own what I buy. I would not have to live in despotism. I could have my life restored. I could give my family a future. I could give mankind a future. I could help people. I could build the products that I wanted to build. I could pursue happiness!  A major benefit on everyone's behalf.  A future for our society.

All I needed was money. I had spent years trying to get work with no luck. Although I suspected I was blacklisted at the time (because that is what Nortel's attorney had threatened), I did not know for sure.  I just figured that if I could not get a job in the field I had worked in for over 30 years there was little chance I could get a job in another field.  I had borrowed everything I could on our house. My credit card debt was mounting and getting close to maximum.  I felt that somehow I had to get back some of what was stolen from me.  Even my tort suit against the Town of Chelmsford for stealing my land provided no hope since the court was delaying it for years.  Even though Verizon and Comcast did not directly steal from me, they buy their products from Nortel and others who have stolen from me. I felt they were the benefactors from the theft of my property.  In my exhaustion, confusion and anger I saw no other means to get back what Nortel had stolen from me.

I would have done anything other than this extortion, but at the time I truly felt I had no other choice. I know it was the wrong thing to do, but the FBI and government agencies had flatly refused to help me. Even after the situation broke the FBI still refused to help me.

I truly am sorry for what I did. I wrongly felt I had no other choice. I am sad that my engineering career has been destroyed. Financially I am far worse off than I was 30 years ago. It is only a dream to get back to where I was 20 years ago.  My family is the most important thing to me and I do not want to see it destroyed. I made a terrible mistake and I apologize to them and to anyone else I have harmed.  I would like to state that I have started a new career as a housepainter and construction worker, and be it hard physical labor I have accepted the fact that my previous career is dead. I think that I could actually support my family by doing these jobs and I have several upcoming contracts I hope I don't have to pass up. I just need to know if I will be allowed to keep my family together so that I can build this business. Therefore there is no advantage in punishing me anymore and destroying my family. It is to everyone's advantage to allow my family to remain intact and I pray that the court will see this.

Sincerely,

Dan Kelly

December 2, 2005

The Honorable Joseph Tauro
United States District Court
Boston, MA

Dear Judge Tauro:

My father is the most caring and loving father I could ever hope to have. He works very hard to provide for the family. He has always supported me and been there to help me at all times.

He is very fair-minded. When I was in middle school and he coached my soccer team he insisted that everyone should get a chance to play in every game, not just the best players. He believed that little league sports should be focussed on the fun of the game and improving everyone's skills. This was very different from other coaches I had who felt it should be strongly competitive.

He has always taught me to build things and be creative. He took me into his shop and built things like woodworking projects and electronics. We built many projects and costumes together for Cub Scouts and we often won prizes for them. He always encouraged me to think creatively. He taught me to care for my car and to be self-reliant.

He has also taught me to think kindly and fairly toward others. I always took inspiration from his generosity and his hard-working ideals. He taught me to contribute to society and to have a social consciousness. It impresses me when he offers to babysit for my friends' baby free of charge because he wants them to have a break. He strongly feels that we should help one another and because it is the right thing to do and not because we are paid to.

When I am at school I call him often because he keeps me encouraged and I need his advice.

Thank you.

Sincerely,

*Pat De Kelly*

Patrick DeKelly

December 1, 2005

The Honorable Joseph Tauro
United States District Court
Boston, MA

Dear Judge Tauro:

My dad is the entire basis of what my family has. He works for the money we
have even though he is over 50 and it kills him working so long painting condos, which is
the only way he can get money now. He worked at UPS during the early hours of the
morning, trying to get my family health and dental insurance. He keeps everything in our
house going, he just put in a new furnace to keep us heated during the cold winter. My
car broke about 2 months ago and he fixed it, he fixes every car we have. If we didn't
have him around we probably would not be able to keep our cars going, we would be
trapped. We do not have the money to hire people to fix our house or cars so my dad is
our only option and without him around not only will we have no one to fix problems we
also lose our one way of getting money, since neither of my parents can get a job
engineering.

I have one and a half years left of high school, my parents have been able to give
me a solid base to live in the same community all my life, if my dad is away for 2 years
then I have no idea what we can do, since he is our whole financial basis right now but I
will most likely have to leave the life I have always known and I am so close to finishing
HS and going to college. All I ask is the next year and a half. From our financial view we
can only go about 2 months without my dad actively making money before we have
nothing. Our house is mortgaged so much we will get nothing from selling it and so then
we will have no options. If my dad is gone for two years, I can't predict the future, but I
am almost positive, since we have no rich or close relatives, that we will have to lose
everything my parents have made

I talk to my dad everyday, we joke, play with the dog, talk seriously; he has given
me so much. He is one of the nicest people ever; he would do almost anything for
anyone, even complete strangers. My brother's friends are young, trying to get started on
life and my dad has helped them move, invited them to stay at our house instead of being
homeless, and has driven out to help them when their cars break down on them and they
are stuck on the highway. He is one of the most giving people.

Thank you.

Sincerely,

Emily DeKelly

Emily DeKelly

November 30, 2005

The Honorable Joseph Tauro
United States District Court
Boston, MA.

Dear Judge Tauro:

Danny Kelly is my husband of 24 years and I have known him for 29 years.  He is one of the most intelligent, kind, generous, hardworking and self-sacrificing people I have ever known.  He has always been physically and morally supportive of me in everything I have done, especially in my pursuit of a degree and in my art career. He eagerly sacrifices his time and hard work for anyone who asks for help, whether the call is from family, friends or even strangers.  People know he is this way and call upon him when they have emergency situations with cars and homes, whether they need advice or direct help.

Dan is and old-fashioned man in that he knows how to build and repair homes and autos.   He keeps many of the essential systems in our 120-year-old home running, saving us a lot of money when money is tight.  He wants nothing more than to renovate his home and have opportunities to work in engineering, tasks which he pursues diligently.

He loves his children very much and has always been available to them at any time of day or distance.  He worries that he won't be able to get them through college.  He has allowed our son's young adult friends to stay with us when they have nowhere to go and they also feel they can call on him for help at any time.

Dan works in difficult physical jobs, such as United Parcel Service and house-painting, which should not be done by a man of his age.  He often receives injuries but he is willing to sacrifice to support his family.  He hopes to return to computer engineering and regularly applies to jobs but has not yet been successful due to the poor engineering job market.  (I am also an engineer, but do not have work due to the same poor market.)

Dan's financial support is the family's only source of income and without his presence his painting contracts would dry up, leaving us completely without resources.

I have always known that Dan is a wonderful person and his family really can't survive without the support he gives, both financially and emotionally.

Thank you.

Sincerely,

May DeViney

May DeViney

December 5, 2005

The Honorable Joseph Tauro
United States District Court
Boston, MA

Dear Judge Tauro:

I met Dan Kelly working as a senior design engineer at Mitre Corporation in Bedford, MA in the mid-1980s. His knowledge of technology and insight were instrumental in designing a variety of complex electronic equipment for the U. S. Military. He always demonstrated good character and dedication required to complete a successful design.

After retiring from defense electronics, I became a real estate professional engaged in building, managing and selling real estate. Since then, I often consulted Dan for advice about building and maintenance issues. Often, I hire Dan for repairs and new construction. I have found him to be very reliable, hardworking and honest. His dedication allows him to complete a job even when unexpected difficulties arise. People at the condominium complexes where he performs a lot of his work are very appreciative of both his technical skills and people skills. I consider him a great colleague and friend.

Thank you.

Sincerely,

Robert D. Braun, Ph.D., MA Licensed Broker, MA Licensed Construction Supervisor

**William C. Rudow**
**101 Middlesex Tpk. #L-416**
**Burlington, Mass. 01803**

December 5, 2005

The Honorable Joseph Tauro
United States District Court
Boston, Mass

Dear Judge Tauro:

I would like to submit this document as a reference of good character for Daniel Kelly.

I have known Dan Kelly since 1985 when I worked with him at the MITRE Corporation, in Bedford, Mass. where he worked along with myself as a systems engineer. Dan has many strong technical skills and has been helpful in some of my work projects.

I have stayed in touch with Dan over the years. Some of these years he has worked successfully as software consultant, and some as a construction contractor. He has made a tough but successful transition from the engineering field to the property management and maintenance field. He has always been a kind and helpful person to his friends and customers. He has the ability to explain construction related matters in a clear and honest manner.

Please contact me if I can provide details or further assistance.

Sincerely:

William C. Rudow
Property Manager
978-667-2314

Curriculum Vitae

**Roger H. Gray, M.D.**
112 Sargent Street
Newton, MA  02458
Telephone:  617-965-2713
D.O.B.  January 14, 1945

I.    Education
A.    University of Minnesota
      B.A., English Literature, 1968
      School of Architecture, 1967 - 1969
B.    Tufts University, School of Medicine, Boston, MA  1973-1977

II.   Post-Graduate Training:  Tufts-New England Medical Center and Affiliates
A.    Medical Internship:  July 1977 - June 1978 at the Shattuck, Faulkner, and Jamaica Plain V.A. Hospitals
B.    Psychiatric Training:
      1.    Jamaica Plain V.A. Hospital:  July 1978 - June 1979
      2.    New England Medical Center:  July 1979 - June 1980
      3.    Jamaica Plain V.A. Hospital:  July 1980 - June 1981 Chief Resident, Ward 12-C (In-Patient Service)
      4.    New England Medical Center:  July 1980 - June 1981

III.  Work Experience
A.    Medical Director, Adult Psychiatric Unit, Caritas Norwood Hospital  October 1999 - Present
B.    Associate Medical Director, Adult Psychiatric Unit, Southwood Community Hospital April 1994 - October 1999
      Associate Medical Director, Geropsychiatric Unit, Southwood Community Hospital January 1992 - October 1999
      Medical Director, Partial Hospital Program
      Southwood Community Hospital  May 1992 - October 1999
C.    Medical Director, Clinical Director, American Geriatric Services, Inc., formerly known as Alpha Geriatrics:  November 1988 - December 1991.  Development and administration of inpatient medical-psychiatry services and out-patient consultation services for elderly patients.  Training and supervision of multi-disciplinary team. Direct services for geriatric patients.  Development of Utilization Review and Quality Assurance Programs.
D.    Private Practice:  July 1981 to present.
      Psychotherapy with adults, couples, and families.
      Psychotherapy supervision and consultation
E.    Beth Israel Hospital, Boston, MA:  July 1988 to 1990, Staff Psychiatrist, Consultation-Liaison Service, Clinical Instructor for Harvard Medical School.
F.    St. Margaret's Hospital, Dorchester, MA:  September 1987 - January 1989, Psychiatric Consultant
G.    Carney Hospital, Dorchester, MA:  December 1983 - June 1988.
      1.    Director of Psychiatric Consultation-Liaison Service.  Provided and coordinated services, provided instruction to primary care residents, formulated policies, instruction to coronary care unit.

2.      In-patient Attending: December 1983 - September 1986
3.      Teaching of primary care residents and directing house officers' group for 1984 - 1987.
4.      Psychotherapy supervision of nursing graduate student for 1984 - 1986.
5.      Grand rounds for the Department of Psychiatry and Medicine.

H.     Cambridge Hospital, Inpatient Psychiatry, Attending Physician, Supervision of Psychiatric Residents, Psychology Interns, and Medical Students: July 1981-December 1983

I.     Medical Director, 735 Inc, Melrose, MA Outpatient Mental Health Clinic: July 1981-December 1983

J.     Forensic Consultations: 1983-Present

IV.    Massachusetts License, Board of Registration and Discipline in Medicine, #43790, issued February 21, 1979.
American Board of Psychiatry and Neurology, #28364, issued November 1986.

V.     Professional Affiliations
         Massachusetts Medical Society

VI.    Community Activities: Member, Dedham Board of Health, March 1985 - March 1988

VII.   Publications
A.     Sun Chronicle, monthly mental health issues column, October 1994 to September 1997 .
B.     "Filming Adolescent Activities," Hospital and Community Psychiatry, August 1971.
C.     "The Role of the Library in an Adolescent Service," Hospital and Community Psychiatry, May, 1972 (with Anton O. Kris, M.D.).

VIII.   Teaching

Workshop: Psychotherapy with Elderly Patients in Long Term Care Settings, presented at the Northeastern Gerontological Society, 1991 Annual Conference at Albany Hilton, Albany, New York, April 19, 1991.

Workshop: Psychotherapy of Nursing Home Residents with Character Disturbances, presented at the American Psychological Association, 1991 Annual Convention, San Francisco, California, August 20, 1991.

Workshop: The Wolf in Sheep's Clothing: Medical Illness and Psychiatric Symptoms, presented at the Massachusetts School of Professional Psychology, Dedham, Massachusetts, November 14, 1991.

Conference: Alzheimer's Disease: Society's Response, presented at Stonehill College, Easton, Massachusetts by The Alzheimer's Partnership, August 5, 1992.